1

2

3

4

5

6

7

8

9          UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

11

12  CHAZ A. STEWART,                )    Case No. ED CV 14-01573-AS
                                    )
13              Plaintiff,          )    **MEMORANDUM OPINION AND**
                                    )
14       v.                         )    **ORDER OF REMAND**
                                    )
15  CAROLYN W. COLVIN,              )
    Acting Commissioner of the      )
16  Social Security Administration,)
                                    )
17              Defendant.          )
                                    )
18  _____     )

19      Pursuant to Sentence 4 of 42 U.S.C. § 405(g), IT IS HEREBY ORDERED

20  that this matter is remanded for further administrative action

21  consistent with this Opinion.

22

23                    **PROCEEDINGS**

24

25      On July 30, 2014, Plaintiff filed a Complaint seeking review of the

26  denial of his applications for Supplemental Security Income and

27  Disability Insurance Benefits. (Docket Entry No. 1). The parties have

28  consented to proceed before the undersigned United States Magistrate

    Judge. (Docket Entry Nos. 6, 15). On December 4, 2014, Defendant filed

an Answer along with the Administrative Record ("AR"). (Docket Entry Nos. 8-9). The parties filed a Joint Position Statement ("Joint Stip.") on March 4, 2015, setting forth their respective positions regarding Plaintiff's claims. (Docket Entry No. 13).

The Court has taken this matter under submission without oral argument. See C.D. Cal. L.R. 7-15; "Order Re: Procedures In Social Security Case," filed August 5, 2014 (Docket Entry No. 5).

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On January 18, 2011, Plaintiff, formerly employed as a merchandiser and mechanic (see AR 47-49, 204, 228-30), filed applications for Supplemental Security Income and Disability Insurance Benefits, both alleging an inability to work since July 13, 2008. (AR 185-93). On December 14, 2012, Administrative Law Judge ("ALJ"), Jesse Pease, heard testimony from Plaintiff and vocational expert David Rinehart. (See AR 45-69). On December 20, 2012, the ALJ issued a decision denying Plaintiff's applications. (See AR 26-38). After determining that Plaintiff had severe impairments -- "post traumatic stress disorder (PTSD); complaints of chronic back and right knee pain; and complaints of headaches" (AR 28-29) --, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[1] to perform medium work[2] with the following exceptions: no working around crowds; limited to a non-public

---

[1]     A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[2]     "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

environment; and precluded from complex work.  (AR 31).  After finding that Plaintiff was unable to perform past relevant work as a merchandiser and auto mechanic (AR 35-36), the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform, and therefore found that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 36-37).

Plaintiff requested that the Appeals Council review the ALJ's decision.  (AR 20).  The request was denied on February 20, 2014.  (AR 6-10).   The ALJ's decision then became the final decision of the Commissioner, allowing this Court to review the decision.  See 42 U.S.C. §§ 405(g), 1383(c).

**PLAINTIFF'S CONTENTIONS**

Plaintiff alleges that the ALJ erred in (1) failing to properly determine Plaintiff's RFC by giving little weight to the opinion of Plaintiff's treating physician, Dr. Guo, and the disability determination made by the Department of Veteran's Affairs, and in determining an RFC that was not supported by the medical evidence; (2) determining that Plaintiff was not fully credible; and (3) determining that Plaintiff could perform other jobs. (See Joint Stip. at 4-16, 24-36, 39-44).

**DISCUSSION**

After consideration of the record as a whole, the Court finds that: (1) Plaintiff's second claim of error challenging the ALJ's credibility

3

determination has no merit; (2) Plaintiff's first claim of error regarding the ALJ's RFC determination, specifically, the little weight given to the Plaintiff's treating physician has no merit, but Plaintiff's claim that the ALJ erred in giving little weight to the partial disability determination of the Department of Veteran's Affairs has merit and warrants a remand for further consideration.

Since the Court is remanding the matter based, in part, on Plaintiff's first claim of error, the Court will not address Plaintiff's claim that the ALJ's RFC determination (that Plaintiff could perform medium work) was untraceable and unsupported by medical evidence, or Plaintiff's third claim of error, namely, that the ALJ erred by finding that Plaintiff could perform other jobs.

**A.   The ALJ Properly Assessed Plaintiff's Credibility**

Plaintiff asserts that the ALJ failed to properly assess Plaintiff's credibility. (See Joint Stip. at 29-36, 39-42). Defendant asserts that the ALJ provided proper reasons for finding Plaintiff not fully credible. (See Joint Stip. at 36-39).

At the administrative hearing, Plaintiff testified as follows:

He lives by himself in an apartment. After working for four years as a stocker of magazines, Plaintiff quit the Friday before the hearing, because his back and knee problems are getting worse. He worked about 4 hours day, and at most 6 hours a day. (See AR 47-48, 57, 59).

He has physical issues with his right knee and lower back. His right knee tends to grind when he walks. He had a lateral bulge on his lower back. His back has gotten worse over the years. The pain in his back radiates down his leg to his toe (he has a tingly sensation in his toe when he walks). The average pain level in his back and right knee is about a 7, and the average pain level in his ankle is about a 6 (his ankle is getting a little better). Although there had been discussion about back surgery, he was told he was too young. He gets migraine headaches every day; he takes Vicodin to go to sleep (on rare occasions he still has a migraine headache when he wakes up). He gets migraines because of stress or the weather (heat). He has trouble sleeping at night; he sleeps about 4 hours a night. He feels tired during the day, and tries to take a nap once in a while. (See AR 51-52, 56-59, 61-62; see also AR 240 [In a Disability Report - Field Office submitted on the internet on September 8, 2011, Plaintiff reported drowsiness from Vicodin]).

If he had to work as a cashier or as a hand packer for 8 hours one day, he probably would not be able to walk the next day. He has trouble sitting and has to adjust a lot or find a comfortable place for his back. At the start of the day, he can sit for about 10 to 15 minutes. He can stand for about 10 to 15 minutes. He can sit and stand about 2 hours in an 8-hour day. He can lift about 5 to 10 pounds (he threw out his back one time this year). With difficulty, he can go on his

knees and get back up.  He can walk up and down a flight of stairs, but it is painful.  (See AR 53-54, 57).

He sees a psychiatrist once every two months for his post-traumatic stress disorder.  He has been prescribed medicine, but the medicine does not work (his nightmares are ten times worse).  He avoids crowds; in a classroom, he sits in the back corner.  He cannot handle a job dealing with a lot of people.  (See AR 54-55, 58).

He attends community college full time (studying business), and he is presently in his fourth year.  (While he has 93 credits -- substantially more than the 60 credits necessary to get an AA degree -- they were not in specific areas.)  This semester was his worst semester with respect to his grades, the result of his not being able to focus and not having the energy (he has missed about six classes this semester).  (See AR 50-51, 53).

He cooks, cleans, and shops at the grocery store.  He has a driver's license and drives.  He drives to school two times a week, for twenty-five minutes (which he says is past his limit).  He spends time on his computer.  He breeds reptiles (leopard geckos and ball pythons).  (See AR 59, 62-63).

He used to go hiking, ride bikes and go swimming.  He also used to go to clubs and hang out with friends (he no longer feels comfortable there).  (See AR 60).

He receives $560 a month from the Department of Veterans Affairs based on 40 percent of disability related to physical issues with his right ankle and migraine headaches. (See AR 48-49, 52).

After summarizing Plaintiff's testimony (see AR 31-32), the ALJ made the following assessment of Plaintiff's credibility:

The claimant's testimony and statements of record are credible to the extent those statements are consistent with the conclusion the claimant can do the work described herein. . . . After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In terms of the claimant's alleged physical impairments, a review of the record demonstrates the claimant has received fairly routine, conservative treatment. In January 2009, the claimant was evaluated by Sidney Jones, M.D. for purposes of a veteran compensation and pension examination related to the right knee and ankle (Exhibit 1F, pp. 27-28). Although the claimant did report subjective complaints of pain, he denied any incapacitating episodes, functional limitations or any effect on his daily activities (Exhibit 1F, p. 27). Range of

motion in both the right knee and ankle were not limited by pain or weakness.  X-rays of the joints were within normal limits (Exhibit 1F, p. 28).  A March 2009 x-ray of the right knee and a July 2009 x-ray of the right ankle were normal (Exhibit 1F, pp. 80-81).

In February 2011, the claimant sought treatment from the pain clinic for his back and was last seen there in September 2010 (Exhibit 1F, p.39).  A physical examination showed good range of motion, but was limited by pain, straight leg raise test was positive on the right side, and he was tender to palpation in the paraspinous area bilaterally (Exhibit 1F, p. 40).  An x-ray showed spina bifida occulta of S1, but otherwise showed no acute bone change or significant arthritic chance.  The claimant was assessed with lumbar spondylosis, lumbar radiculopathy, and spina bifida occulta.  The claimant was recommended to continue home exercises, use of the TENS unit, and to consider other conservative options such as chiropractic care or acupuncture (Exhibit 1F, p. 41).  Although the claimant underwent lumbar epidural injections and lumbar face injections, he found them to be ineffective in alleviating his pain (Exhibit 1F, pp. 65, 67-68).  In April 2011, the claimant' [sic] obtained an MRI of the lumbar spine, which revealed minor degenerative change with desiccation of the L5-S1 disc, unremarkable neuroforamina, a 3-millimeter bulging annulus at L5-S1, and no herniation of the disc or spinal stenosis (Exhibit 2F, p. 4).  These findings did not warrant any recommendations for more aggressive treatment.

In January 2012, the claimant returned to the pain clinic (Exhibit 5F, pp. 34-37). On examination, the claimant had full range of motion in extension, lateral bending, and rotation, but limited range of motion in flexion. He also exhibited tenderness on palpation in the lower lumbar area. The straight leg tests were negative bilaterally. Notably, the claimant had normal strength through his extremities and his gait was observed to be within normal limits (Exhibit 5F, p. 36). Based on the clinical findings and a review of the MRI, the claimant was prescribed a new TENS unit, physical therapy, and medication (Exhibit 5F, p. 37). Despite the alleged severity of the low back pain, the claimant had only attended three physical therapy sessions by May 2012 because he was not receiving reminders on his phone and he had forgotten about some of his appointments (Exhibit 6F, p. 3). Moreover, he had not been performing his home exercises on a regular basis (Exhibit 6F, p. 14). Tellingly, a recent diagnostic study of the claimant's lumbar spine performed in September 2012 was normal (Exhibit 7F, p. 14). Although the claimant complained of increased symptoms in October 2012, the claimant was merely advised on the importance of wearing shoes with good support and to alternate cold pack and warm moist heat (Exhibit 7F, pp. 52-53). The conservative nature of the treatment is inconsistent with an alleged disabling condition.

With regard to the right knee, the claimant was provided a brace, which he found to be effective with controlling his knee pain (Exhibits 1F, p. 66 and 5F, p. 39). In December

2011, when he sought treatment for right knee pain, he indicated physical therapy helped and was interested in receiving steroid injection for pain relief.   A physical examination revealed he had full range of motion on flexion and extension and normal strength in the lower extremities.   However, he did have a positive Valgus stress test in the right lower extremity and antalgic gait.   After he was treated, he was instructed to return in three months for a follow-up examination (Exhibit 5F, pp. 39-41).   Although the claimant continued to complaint [sic] of pain, the frequency of the follow-up visit suggests the claimant's alleged impairment was not as severe as alleged.   Tellingly, a recent diagnostic study of the claimant's knee performed in September 2012 was normal (Exhibit 7F, p. 14).

With regard to the migraine headaches, a February 2010 magnetic resonance imaging (MRI) scan of the claimant's brain was unremarkable (Exhibit 5F, p. 25).   In October 2010, the claimant's symptoms were assessed as tolerable and he was prescribed a trial of Vicodin (Exhibit 1F, p. 60).   By May 2012, the claimant's migraines were considered stable (Exhibit 6F, pp. 4-6).   The claimant's migraines continued to remain stable through September 2012 (Exhibit 7F, p. 63).

*  *  *  *  *

1    Turning to the alleged mental impairments, though the
2    claimant has received consistent treatment, they have been
3    routine counseling treatments (Exhibit 1F, 2F, and 5F-7F).  At
4    times, the claimant did report increased symptoms, but
5    overall, his mental status examinations were generally within
6    normal limits (Exhibits 2F, p. 8; 5F, pp. 45, 55, 63-645, 69-
7    70i; 6F, pp. 16, 23, 30, 38-39, 54-55, 60; and 7F, pp. 42, 44-
8    45, 55, 69, 80-81).  In addition, his global assessment of
9    functioning (GAF) score has ranged between 55 to 70,
10   indicating mild to moderate impairment.  Significantly, a
11   recent GAF score of 70 was assessed in July 2012, which
12   demonstrates that conservative treatment is effective in
13   controlling his symptoms (Exhibit 7F, p. 82).  In fact, the
14   claimant had not expressed interest in psychiatric medication
15   until that time, which will likely further improve the
16   claimant's mental health symptoms (Exhibit 7F, p. 82).
17   Moreover, his symptoms have not worsened to the point where he
18   required hospitalization.  Finally, the claimant has been able
19   to attend and perform fairly well in college courses, which is
20   contrary to what would reasonably be expected for a disabling
21   mental health condition.

23   (AR 32-34, bracketed footnote added).

25     A claimant initially must produce objective medical evidence
26   establishing a medical impairment reasonably likely to be the cause of
27   the subjective symptoms.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir.
28   1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991).  Once a

claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his pain and symptoms only by articulating clear and convincing reasons for doing so. Smolen v. Chater, supra; see also Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

Here, substantial evidence supports the ALJ's finding that Plaintiff's testimony about the intensity, persistence and limiting effects of the symptoms was not fully credible.

First, the ALJ's finding that Plaintiff's abilities to perform certain daily activities, such as living on his own, cooking, cleaning, grocery shopping, driving to college, attending college, taking business-related courses at college, spending time on the computer, breeding reptiles, and working part-time (see AR 31, 34) was a clear and convincing reason for discrediting Plaintiff's testimony. See Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012)("Even where those [daily activities] suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998)("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility."); Light v. Social Security Admin., 119 F.3d 789, 792 (9th Cir. 1997)("In weighing a claimant's credibility, the ALJ may consider his reputation for

truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work history, and testimony from physicians and third parties concerning the nature, severity, and effect on the symptoms of which he complains."); see also Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (ALJ properly discounted claimant's testimony based, in part, on the claimant's ability to recently work).

Second, the ALJ's finding that there was a lack of objective medical evidence supporting Plaintiff's alleged limitations (see AR 32-34) was a clear and convincing reason for partially discrediting Plaintiff's testimony.[3]  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); Morgan v. Commissioner, 169 F.3d 595, 599-60 (9th Cir. 1999).

With respect to Plaintiff's lower back and right knee impairments, the evidence in the record, as discussed by the ALJ, did not support

---

[3]    Contrary to Plaintiff's assertion (see Joint Stip. at 32), the ALJ did not rely *only* on Plaintiff's ability to perform certain daily activities as a basis for finding Plaintiff partially not credible. Moreover, although Plaintiff claims that the ALJ improperly relied on on Plaintiff's conservative treatment to partially discredit Plaintiff (see Joint Stip. at 32-36, 40-42), it appears that the ALJ was actually relying on the lack of objective medical evidence supporting Plaintiff's alleged limitations to partially discredit Plaintiff.

Plaintiff's testimony concerning the limiting effects of his symptoms. Such evidence included the following records from Loma Linda VA Medical Center ("Loma Linda"):

*2009*

(1) a March 27, 2009 imaging report of Plaintiff's right knee (see AR 560-61 [containing the following findings: "There is no bony or joint space abnormality.  No evidence of fracture[.]"]); (2) a July 15, 2009 evaluation of the right knee and ankle for purposes of a veteran compensation and pension examination[4] (see AR 281-82 [noting that he did not take any medications, denied any incapacitating episodes, functional limitations or flares, or any effect on his daily activities; finding that the range of motion in his right knee and right ankle was not limited by pain or weakness, the knee was stable to varus and valgus stress and to anterior and posterior stress, and that radiographs of the right knee and X-rays of the right ankle were within normal limits; and diagnosing a "[r]ight ankle sprain secondary to (blank) ankle sprain" and "[r]ight knee pain secondary to inflammation of the patella and quadriceps tendon"]); (3) a March 27, 2009 x-ray report of the right knee (see AR 334-35 [finding "no bony or joint space abnormality"])[5]; and

_____

[4]    The ALJ and Respondent state that this evaluation took place in January 2009.  (See AR 32; Joint Stip. at 17-18).  However, the only date on the report of the evaluation is July 15, 2009.  The Court notes that Plaintiff does not even discuss this evaluation.

[5]    The ALJ incorrectly stated that the x-ray of the right knee took place in September 2012, rather than March 2009 (see AR 33). However, that x-ray took place after the alleged onset of disability date (July 13, 2008), and did not support Plaintiff's testimony about the disabling effect of his symptoms related to his right knee (continued...)

14

(4) a July 13, 2009 x-ray report of the right ankle (<u>see</u> AR 334 [finding no "fractures or soft tissue abnormalities"]).

*2010*

(1) a January 8, 2010 report concerning imaging of Plaintiff's lumbrasacral spine (<u>see</u> AR 333-34 ["No fracture, dislocation or bone destruction is noted.  There is spina bifida occulta of S1."]); (2) a June 1, 2010 physical medicine rehab note (<u>see</u> AR 327-29 [noting evidence of S1 spina bifida occulta and right ankle extensor tendinitis]); (3) a July 28, 2010 pain consult note (<u>see</u> AR 322-26 [good range of motion in the back, limited by pain (which was worse with extension and bilateral oblique extension and axial loading), a mild positive straight leg raise test on the right side, and tenderness to palpation of the paraspinous area bilaterally; diagnosing lumbar spondylosis, lumbar radiculpathy, and spina bifida occulta; and recommending injections, continued home exercises and a TENS unit]); (4) August 26, 2010 and September 10, 2010 reports of fluoroscopies for injections (<u>see</u> AR 330-31); and (5) a September 8, 2010 physical medicine rehab note (<u>see</u> AR 320 [ordering a patella tracking brace]).

///

///

///

---

[5] (...continued)
impairment.

*2011*

(1) a January 27, 2011 report of imaging of the right ankle (see AR 330 ["7 mm ovoid density is seen, which may represent an accessory ossicle versus an old fracture fragment.  Mild surrounding soft tissue swelling is seen, particularly lateral aspect."]); (2) January 28, 2011 nursing notes (see AR 303-05 [suffered right ankle swelling after rolling his ankle, and complained of an increased amount of right knee pain]); (3) a February 18, 2011 occupational consult record (see AR 297-300 [noting complaints of pain in the center of his lower back and intermittent shooting pain down the back of his right thigh, had a TENS unit and took Vicodin (both of which alleviated some of the pain), had two sessions of epidural injections which did not significantly alleviate the pain, and complained of pain in the right ankle; finding a decreased range of motion on right ankle flexion and tenderness in his right ankle; and with respect to Plaintiff's back, had tenderness to palpation "on the bilateral side of L4," and "the paraspinal muscles of L4," "[n]o tenderness to the vertebral bodies of the lumbar spine," a full range of motion "on flexion/extension with exacerbation of tenderness in the lower lumbar spine," a full range of motion "on bilateral bending," "[t]enderness in the right lumbar parspinal muscles on standing on right foot", and a straight leg raise test showed "localized tenderness in the lumbar spine"; and diagnosing chronic low back pain, arthralgia of the knee and foot pain]); (4) a February 24, 2011 pain clinic note (see AR 293-95 (noting that he was last seen in the pain clinic in September 2010, at which time he had two injections, i.e., lumbar epidural and lumbar facet, see AR 319-20, which did not provide pain relief, complained of back pain radiating down the right

leg which increased with prolonged standing and bending over and temporarily decreased with the TENS unit and laying down; finding his back had a good range of motion (limited by pain, which was worse with extension), his straight leg raise test was positive on his right side, and there was tenderness to palpation in the paraspinous area bilaterally, the verterbral height and disc spaces were maintained, there was no fracture, dislocation or bone destruction, and there was no acute bone change or significant arthritic change; and diagnosing lumbar spondylosis, lumbar radiculopathy, and spina bifida occulta; and recommending an MRI, continued home exercises, the TENS unit, and consideration of other options (i.e., chiropractor, acupuncture)]; (5) an April 8, 2011 MRI report of the lumbar spine [see AR 342-43 [finding mild degenerative change with desiccation of L5-S1, a 3 mm bulging annulus of L5-S1, no herniation of disc or spinal stenosis, no intradural abnormal signal intensity, and unremarkable bilateral neuroforamina, conus medullaris and paraspinal regions; and diagnosing "[m]ild degenerative change with dessication of L5-S1 disc" and 3 mm bulging annulus of L5-S1]); (6) a July 15, 2011 orthotics prothetics consult note stating that adjustments were made to his custom knee brace, and he would be given a new brace to try out (see AR 445-46); (7) an October 17, 2011 internal medicine note (see AR 431-33 [he stated his knee brace helped with his daily out of home activities (although it caused secondary pain due to rubbing) and his foot/ankle pain did not limit his activity; finding, with respect to the back, "symmetric, verterbral and parapverterbral [tenderness to palpation] lumbar and sacral regions"; and finding, with respect to the right knee, "[Tenderness to palpation] medial femoral condyle, and lateral fibular

head, referred numbness with palpation of popliteal fossa"]); and (8) a December 27, 2011 physical medicine rehab consult note (see AR 411-14 [complained of right knee pain, and stated the knee brace helped with knee pain (although the metal bar pushing on the knee caused a different pain), physical therapy had helped a little, and he was interested in steroid injections for pain relief; finding "[s]ymmetric, no erythema along the knee joint," "[n]o effusion palpable, [tenderness to palpation] along the lateral joint lines, a full range of motion on flexion and extension, and normal strength in the lower extremities, but a positive Vaglus stress test in the right lower extremity and an antalgic gait; indicating that he received a steroid injection on the right knee; and recommending a physical therapy refresher course for 2 to 4 sessions and return for a follow up examination after 3 months]).

*2012*

(1) a January 25, 2012 pain clinic note (see AR 406-09 [home exercises helped somewhat with the back pain and he was interested in getting a new TENS unit because it helped with pain; finding a full range of motion in extension, lateral bending, and rotation but limited in flexion due to pain, tenderness on palpation in the lower lumbar area, and that his straight leg raise tests were negative bilaterally, he had normal strength throughout his extremities, and his gait was within normal limits; and prescribing a new TENS unit, physical therapy, and medication]); (2) a March 13, 2012 physical therapy note, following an initial evaluation the day before (see AR 488-91 [noting that he had an "achy pain with radiating numbness and tingling down his [right lower extremity]" which "[c]entralizes with extension," his range of motion

with respect to his lumbar spine was minimally/moderately limited, and there was pain with flexion, right rotation and right sideband, there is tenderness to palpation on the right aspect of the low back, and his straight leg raise test was positive on the right side][6]); (3) an April 2, 2012 physical therapy note (see AR 481-82 [no reported change in pain level since initial physical therapy evaluation]); (4) an April 24, 2012 physical therapy note (see AR 475-77 [stated that pain decreased for approximately 2 days following traction, he had not been performing his home exercises on a regular basis, and he had a "flare up" of pain that morning]); (5) a May 14, 2012 physical medicine rehab note (see AR 465 [he had attended only three physical therapy sessions and stated he did not get telephone reminders and forgot about some appointments]); (6) May 30, 2012 and June 7, 2012 physical therapy notes (see AR 644-47 [noting that he complained of low back pain and had a "flare up" because of the car ride, and that treatment was a hot pack/cold pack, therapeutic exercise, and traction]; (7) a September 19, 2012 report concerning the imaging of the lumbrosacral spine (see AR 559 ["The sagittal and coronal alignment is normal.  Bony ossification is normal.  No loss of verterbral body height or intervertebral disc space is demonstrated.  There is no soft tissue abnormality."]); (8) a May 24, 2012 physical therapy note (see AR 649 [complained of low back pain, stated he has not been doing his home exercises, and pain decreased

---

[6]     As Defendant contends (see Joint Stip. at 38), the ALJ arguably was not allowed to use the physical therapist's March 13, 2012 notation about Plaintiff's positive straight leg raise test as evidence to establish the existence of his lower back impairment.  See 20 C.F.R. §§ 404.1513(a), 416.913(a).  In any event, evidence of the March 13, 2012 positive straight leg raise test (the second of his positive straight leg raise tests, see AR 294 [February 24, 2011]) does not affect the validity of the ALJ's determination about the credibility of Plaintiff's testimony concerning the disabling effects of his lower back symptoms.

following treatment]; and (9) an October 1, 2012 nursing note (<u>see</u> AR 597-98 [during an unscheduled visit, he complained of low back pain, and that he was advised to wear shoes with good support and not wear flip/flops or thongs and to alternate a cold pack with warm moist heat][7]).

Thus, the ALJ properly found that Plaintiff's testimony about totally disabling symptoms was not supported by the medical evidence.

With respect to Plaintiff's migraine headache impairment, the evidence in the record, as discussed by the ALJ, did not support Plaintiff's testimony concerning the limiting effects of his symptoms. Such evidence included the following from Loma Linda: (1) a February 23, 2010 note (<u>see</u> AR 280 [reported suffering migraine headaches]); (2) an October 29, 2010 clinical psychology note (<u>see</u> AR 310-11 [he reported a recent increase in his migraine headaches]); (3) a February 18, 2010 MRI report of the brain (<u>see</u> AR 395-97 ["Brain and ventricles unremarkable. Diffusion shows no acute infarction.  No bleed or mass seen.  Visible portions of paranasal sinuses clear."]); (4) an October 17, 2011 note (<u>see</u> AR 431-33 [he stated he had daily migraine headaches last week in the afternoon and evening, and finding that his headaches were controlled with Vicodin and rest]); (5) an October 26, 2010 note (<u>see</u> AR

---

[7]   Although Plaintiff challenges the ALJ's reliance on such advice on the grounds that it was not given by his primary care physician (<u>see</u> Joint Stip. at 35), the ALJ nonetheless was entitled to rely on it.  In any event, the results of the September 19, 2012 imaging of Plaintiff's lumbrosacral spine (<u>see</u> AR 559), which took place less than two weeks before such advice was given (October 1, 2012), clearly was more critical to the ALJ's determination about Plaintiff's credibility.  (<u>See</u> AR 33 ["**Tellingly**, a recent diagnostic study of the claimant's lumbar spine performed in September 2012 was normal (Exhibit 7F, p. 14)."(emphasis added)]).

312-14 [finding that migraine headaches were tolerable, and he was prescribed a trial of Vicodin]); (6) a May 9, 2012 note (see AR 466-68 [finding migraine headaches were stable]); and (7) a September 10, 2012 internal medicine note (see AR 606-08 [migraine headaches were "on and off" and were triggered by stress and/or lack of sleep; and finding his migraine headaches were stable]).  Such evidence was inconsistent with Plaintiff's testimony of totally disabling symptoms.

With respect to Plaintiff's post-traumatic stress disorder impairment, the evidence in the record, as discussed by the ALJ, did not support Plaintiff's testimony concerning the limiting effects of his symptoms.  Evidence of Plaintiff's mental health treatment consisted of the following records:

*Counseling*

Notes from Loma Linda regarding Plaintiff's visits to psychotherapy or other counseling on several occasions from July 10, 2009 and June 3, 2011, based on his diagnosis of post-traumatic stress disorder (originally diagnosed in January 2009).  These records - (see AR 256-66, 268-70, 309-11, 317-18, 346, 346-48) consistently note that Plaintiff denied any problems with his emotional well-being, and report that Plaintiff was appropriately dressed and well-groomed, generally cooperative and polite, used appropriate eye contact, spoke clearly and normally, had linear flow of thought, normal and logical content of thought, normal perception, was in a good mood and did not show any indication of depression or anxiety, had a full range of affect, was alert and oriented, had good attention and insight, and had intact

judgment.   In addition, mental health notes dated April 25, 2011 and March 13, 2012 noted that Plaintiff was not currently taking any psychotropic medication, but was planning on talking to his primary care doctor about being prescribed psychotropic medication, and stated he had never been psychiatrically hospitalized. (see AR  355-57, 361-64, 374-92, 419-20, 422-23, 426-27, 435-37, 441-43, 447-48, 450-51, 477-78, 484-88, 491-93, 497-501, 508-10, 515-18, and 520-22, 621-29. See also AR 546 [note indicating that on July 25, 2012 he was prescribed Sertraline HCL for depression], 599-601, 613-15 [mental health note dated August 29, 2012, noting that he stated "I'm doing good"]; 631, and 637 [psychiatry note dated June 14, 2012, noting that he had not previously been prescribed any psychotropic medications for his mental health issues]. The ALJ properly found that the medical records reflected routine counseling and mental status examinations generally within normal limits.

   *Evaluation*

   A July 14, 2011 report of a psychiatric evaluation performed by Estelle Tobgy Goldstein, M.D. (a psychiatrist), found inter alia that Plaintiff was neatly and casually groomed, was able to volunteer information spontaneously, his thought process was coherent and organized, his thought content was relevant and non-delusional and he did not have suicidal, homicidal or paranoid ideation (although he said he sometimes saw shadows out of the corner of his eye and sometimes heard voices), his mood was euthymic and his affect was euthymic and congruent with thought content (he stated that he had some, but not a great deal of, depressed moments, that his combat memories were

intrusive, and that he was hypersensitive to loud noises), his speech was normal and clear, he was alert and oriented and was of at least average intelligence, he was able to concentrate and calculate, and he had fair insight and judgment. (see AR 365-70).

### *Global Assessment Functioning*

The ALJ properly found that Plaintiff's Global Assessment of Functioning ("GAF") scores indicated mild to moderate symptoms (see AR 517 [70, February 11, 2009], 510 [70, May 8, 2009], 504 [70, July 10, 2009], 362 [55, March 8, 2011], 347 [55, May 31, 2011], 442 [55, August 29, 2011], 436 [55, September 26, 2011], 423 [55, November 29, 2011], 498 [55, February 29, 2012], 492 [55, March 12, 2012], 478 [55, April 18, 2012], 627 [55, 70, July 25, 2012], 614 [55, August 29, 2012], and 600 [55, September 26, 2012]).[8] As the ALJ pointed out, Plaintiff's GAF was as high as 70 in July 2012 (at least three years *after* he began to seek mental health care treatment, and prior to being prescribed any

---

[8]    A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well and has some meaningful relationships. See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR"), 34 (2000).

   A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." See id.

   "[T]he [GAF] score is used for treatment purposes and not for rating a person's ability to work." Deck v. Colvin, 2014 WL 7388792, *1 (9th Cir.).

1  psychotropic medication).   Moreover, as the ALJ noted, there is no
2  indication in the record that Plaintiff was ever hospitalized for
3  symptoms related to his post-traumatic stress disorder.   Thus, the ALJ
4  properly found that such evidence (or lack thereof) simply did not
5  support Plaintiff's testimony of totally disabling symptoms.

7      Third, the ALJ's finding that Plaintiff's migraine headaches were
8  controlled with pain medication and rest (see AR 33) was a clear and
9  convincing reason for finding Plaintiff partially not credible.   See
10 Warre v. Comm'r of Soc. Sec., 439 F.3d 1001, 1006 (9th Cir.
11 2006)("Impairments that can be controlled effectively with medication
12 are not disabling for purposes of determining eligibility for SSI
13 benefits."); 20 C.F.R. §§ 1529(c)(3)(iv), 416.929(c)(3)(iv) (an ALJ may
14 consider, among other things, the type, dosage, effectiveness and side
15 effects of any medication a claimant takes or has taken in evaluating
16 the intensity and persistence of symptoms, such as pain, and in
17 determining the extent to which symptoms limit a claimant's capacity for
18 work).   As noted by the ALJ, on October 17, 2011, the pain for
19 Plaintiff's migraine headaches was "controlled with vicaden [sic] and
20 rest" (see AR 433), and he reported only mild side effects from taking
21 Vicodin for his migraine headaches (see AR 52-53 [he testified he sleeps
22 after taking Vicodin], AR 240 [he reported drowsiness from Vicodin]).

24     Accordingly, the ALJ did not err in assessing Plaintiff's
25 credibility.
26 ///
27 ///
28 ///

**B.    The ALJ Did Not Err in Assessing the Treating Physician's Opinion**

Plaintiff asserts that the ALJ erred in giving little weight to the opinion of Plaintiff's treating physician, Dr. Guo. (<u>See</u> Joint Stip. at 13-15, 27).  Defendant asserts that the ALJ properly gave little weight to Dr. Guo's opinion.  (<u>See</u> Joint Stip. at 20).

Andrew H. Guo, M.D., Chief of Occupational Medicine at Loma Linda, performed a "Functional Evaluation - Consult" on February 18, 2011, examined Plaintiff, and made the following findings with respect to Plaintiff's lower extremity: "Decrease[d] [range of motion] on right ankle flexion"; "Tenderness over the posterior and anterior borders of the lateral malleolus"; and "Tenderness in this area on inverstion and plantarflexion."  Dr. Guo made the following findings with respect to Plaintiff's back: "[Tenderness to palpation] over facet joints on the bilateral side of L4"; "Tenderness over the paraspinal muscles of L4"; "No tenderness to the verterbral bodies of the lumbar spine"; "Full [range of motion] on flexion/extension with exacerbation of tenderness in the lower lumbar spine"; "Full [range of motion] on bilateral bending"; "Tenderness in the right lumbar paraspinal muscles on standing on right foot"; and "[Straight leg raise test] ellicits [sic] localized tenderness in the lumbar spine[.]"  Dr. Guo diagnosed Plaintiff with chronic low back pain, arthralgia in the knee, and foot pain.  (<u>See</u> AR 297-300).   Under the section on Plans, Dr. Guo made the following comments:

The patient has pain in the lower lumbar spine and right ankle.   The patien[t] had been receiving treatment from

podiatry for the ankle but appears to have been lost to follow up last year.   The patient would benefit from continued treatment and was advised to return to follow up.   The patient has not had extensive workup for the lumbrasacral pain and may benefit from a specialty referral. . . . Given his current findings, I recommend the following physical restrictions: [¶] No prolonged standing/walking over 30 minutes at a time (using orthotics)[;] No lifting/pulling pushing over 20 pounds[;] No Running or jumping[;] No repetative [sic] bending[;] [and] No kneeling, squatting, crawling[.]

(AR 300).

The ALJ addressed Dr. Guo's opinion as follows:

The opinion of Andrew Guo, M.D. is given little weight (Exhibit 1F, p.46). . . .   Although Dr. Guo provided these restrictions after a physical examination, he noted the claimant had not had extensive work for the lumbrosacral pain and had not followed-up with right ankle treatment.   Thus, this appears to be preventative restrictions until the claimant obtained treatment and was not an opinion on the claimant's maximum physical capabilities.   Although it provides insight into the alleged severity of the claimant's impairments, it is not probative in determining the claimant's residual functional capacity.   (AR 34).

Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Magallanes v. Bowen, 812 F.2d 747, 751 (9th Cir. 1989).  The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record.  20 C.F.R. § 416.927(b)-(d).  If the treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (as amended).  If the treating doctor's opinion is contradicted by another doctor, the ALJ must provide "specific and legitimate reasons" for rejecting the treating physician's opinion.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007); Reddick v. Chater, supra, 157 F.3d at 725; Lester v. Chater, supra, 81 F.3d at 830; Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).

Contrary to Plaintiff's assertion, it appears that Dr. Guo was not Plaintiff's treating physician.  The Court has not been able to locate, and Plaintiff has failed to cite, any record reflecting that Dr. Guo treated Plaintiff prior to February 18, 2011.  Thus, the standards set forth above for evaluating the opinion of a treating physician do not apply.  In any event, the ALJ's determination that Dr. Guo's opinion was entitled to little weight because it was not an opinion about Plaintiff's maximum physical capabilities was proper.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (An ALJ "need not accept the opinion of any physician, including a treating physician, if that

opinion is brief, conclusory and inadequately supported by clinical findings.").

**C.    The ALJ Failed to Provide A Proper Reason for Giving Little Weight to the Partial Disability Determination by the Department of Veteran's Affairs**

Plaintiff asserts that the ALJ erred in giving little weight to the opinion of the Department of Veteran's Affairs ("VA"). (See Joint Stip. at 15-16, 28).   Defendant asserts that the ALJ properly gave little weight to the VA's opinion.  (See Joint Stip. at 20).

Plaintiff received a 40 percent rating of disability (30 percent for migraine headaches, 10 percent for tendon inflammation) under the rubric of the VA.  (See AR 571-73, 575-77, 580-82, 584; see also AR 48-49, 297).[9]

The ALJ addressed the VA's disability determination as follows:

Although the claimant currently receives veteran disability benefits based on 40 percent disability due to migraine headaches and tendon inflammation, this determination was made using criteria based on rules of the Department of Veterans Affairs and was not based on the laws or regulations under the Social Security Act (Exhibit 7F, p. 26).  Moreover, the percentage of disability is not indicative of any specific

---

[9]    There is no indication in the record as to when the VA made its partial disability determination.

limitations on the claimant's abilities to perform work-related activity. Although it may provide evidence of the severity of the claimant's physical impairments, the ultimate determination of disability is an issue reserved for the Commissioner (SSR 06-03p). Thus, little weight is given to the disability rating. (AR 34).

"[I]n an [Social Security Disability] case an ALJ must ordinarily give great weight to a VA determination of disability." McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002)("Both programs serve the same governmental purpose--providing benefits to those unable to work because of a serious disability. Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a clamant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims. . . . Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims. Both are administered by the federal government, and they share a common incentive to weed out meritless claims. The VA criteria for evaluating disability and translate easily into SSA's disability framework."). "Because the VA and SSA criteria for determining disability are not identical, however, the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record."). Id.

Here, the ALJ's reasons for giving the VA's disability determination little weight, specifically, (1) the criteria for

determining disability under the VA program and the Social Security Act are different, and (2) the percentage of disability is not indicative of any specific limitations on Plaintiff's abilities to perform work-related activity and the ultimate determination of disability is an issue reserved for the Commissioner, were improper.  See id.; Allen v. Astrue, 2012 WL 234629, *4 ("The ALJ stated simply she was not bound by [the VA's] disability finding.  This is not a persuasive, specific and valid reason for rejecting the VA's finding of disability.").

Therefore, the ALJ failed to provide a persuasive, specific and valid reason for giving little weight to the VA's partial disability determination.  Since there is nothing in the record concerning the basis of and the reasons for the VA's partial disability determination, the Court is unable to find that the ALJ's error was harmless.  See Tommassetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008)(an ALJ's error is harmless "when it is clear from the record . . . that it was 'inconsequential to the ultimate nondisability determination.'").

**D.   Remand Is Warranted**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  Id. at 1179 ("[T]he decision of whether to remand for further proceedings turns upon

the likely utility of such proceedings."). However, where, as here, the circumstances of the case suggest that further administrative review could remedy the Commissioner's errors, remand is appropriate. <u>McLeod v. Astrue</u>, 640 F.3d 881, 888 (9th Cir. 2011); <u>Harman v. Apfel</u>, <u>supra</u>, 211 F.3d at 1179-81.

Since the ALJ failed to provide a proper reason for giving little weight to the Department of Veteran Affairs' partial disability determination, remand is appropriate. Because outstanding issues must be resolved before a determination of disability can be made, and "when the record as a whole creates serious doubt as to whether the [Plaintiff] is, in fact, disabled within the meaning of Social Security Act," further administrative proceedings would serve a useful purpose and remedy defects. <u>Burrell v. Colvin</u>, 775 F.3d 1133, 1141 (9th Cir. 2014)(citations omitted).[10]

///

///

///

_____

[10]  Except for the issues concerning the ALJ's assessment of Plaintiff's credibility and the opinion of Plaintiff's treating physician, the Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time. "[E]valuation of the record as a whole creates serious doubt that Plaintiff is in fact disabled." See <u>Garrison v. Colvin</u>, 759 F.3d 995, 1021 (2014). Accordingly, the Court declines to rule on Plaintiff's claim that the ALJ's finding that Plaintiff could perform medium work was untraceable and unsupported by medical evidence (see Joint Stip. at 8-13, 24-26), and that the ALJ erred in finding that Plaintiff could perform other jobs (see Joint Stip. at 42-44). Because this matter is being remanded for further consideration, these issues should also be considered on remand.

**ORDER**


    For the foregoing reasons, the decision of the Commissioner is reversed, and the matter is remanded for further proceedings pursuant to Sentence 4 of 42 U.S.C. § 405(g).  On remand, the ALJ should make sure the record is fully developed with respect to all records relevant to the VA's partial disability determination.


    LET JUDGMENT BE ENTERED ACCORDINGLY.


DATED: November 2, 2015.


                            _____
                                      /s/
                                  ALKA SAGAR
                            UNITED STATES MAGISTRATE JUDGE